598 So.2d 41 (1992)
In re AMENDMENTS TO RULES REGULATING THE FLORIDA BAR  13.1(a) AND RULES OF JUDICIAL ADMINISTRATION  2.065 (LEGAL AID).
No. 74538.
Supreme Court of Florida.
February 20, 1992.
Rehearings Denied June 1, 1992.
Talbot D'Alemberte and Randall C. Berg, Jr. of Steel, Hector & Davis, Miami, for fifty-eight active members of The Florida Bar, for petitioner.
Benjamin H. Hill, III, President, Tampa, Alan T. Dimond, President-elect, Miami, James A. Baxter, Chairman of Board of Governor's Committee on Access To The Legal System, Clearwater, John F. Harkness, Jr., Executive Director and Mary Ellen Bateman, UPL Counsel, Tallahassee, for The Florida Bar, Anthony C. Musto, Chairman, Florida Rules of Judicial Admin. Committee, of Musto, Zaremba and Rosenthal, Coral Gables, James E. Tribble of Blackwell & Walker, P.A., Miami, and Gerald T. Wetherington, Circuit Judge, Eleventh Judicial Circuit, Kendall B. Coffey, President and Sharon L. Langer, Director, Miami, for Dade County Bar Ass'n, Robert M. Brochin, Asst. Gen. Counsel, Office of Governor, Tallahassee, for Governor Lawton Chiles and Lieutenant Governor Kenneth H. MacKay, Jack McLean, Jr., President of Project Directors Ass'n and Scott T. Manion, Executive Director of Florida Legal Services, Tallahassee, for The Project Directors Ass'n, Michael H. Davidson, Fort Lauderdale, Florida, Henry P. Trawick, Jr., Sarasota, Brian C. Sanders, Fort Walton Beach, Joseph W. Little, Gainesville, Harvey M. Alper, Altamonte Springs, Richard A. Culbertson, Orlando, and Jerry A. DeVane, Lakeland, and Milton A. Galbraith, Jr., Clearwater, active members of The Florida Bar, for respondent.
William A. VanNortwick, Jr., Chair, of Martin, Ade, Birchfield & Mickler, Jacksonville, C. Hamilton Cook, Vice-Chair, West Palm Beach, and Paul C. Doyle, Staff Director, Orlando, for the Report of The Florida Bar/Florida Bar Foundation Joint Com'n on the Delivery of Legal Services to the Indigent in Florida.
OVERTON, Justice.
This Court, in its decision rendered on December 13, 1990,[1] delayed its determination of the proper means to address the problems of legal representation of the poor in order to consider the "Report of the Florida Bar/Florida Bar Foundation Joint Commission on the Delivery of Legal Services to the Indigent in Florida," filed March 21, 1991.
In this report, the Commission states that the "[c]ritical legal needs of the poor generally and of groups with special legal needs such as children, institutionalized persons, and migrant farm workers are not being met with present resources and will not be met with the presently anticipated increase in resources." The Commission "concludes that only approximately twenty percent of the legal needs of the poor are being addressed." In its thorough and detailed report, the Commission made thirtyone recommendations. A summary of the Commission's findings and recommendations is attached as Appendix I.[2] The recommendation in issue in this cause is recommendation No. 24 entitled "Voluntary Pro Bono Legal Services," and it is attached as Appendix II.
In summary, recommendation No. 24: (a) describes a range of activities for volunteer lawyers; (b) suggests a minimum for each attorney of twenty hours of voluntary pro bono legal services, which can be collectively met under certain circumstances, or an alternative contribution to legal services of $350; (c) narrowly defines pro bono services *42 to assure availability of legal services to the poor; (d) suggests that these services be developed and controlled by local community entities; (e) suggests that all lawyers be included in the plan to the extent legally and practically feasible; (f) suggests additional resources to support the plan; (g) describes a means to determine accountability of lawyer participation; and (h) suggests an evaluation and review of the effectiveness of this plan after two years.
The Board of Governors of The Florida Bar has endorsed the Commission's voluntary pro bono plan and urges its adoption with certain modifications. These modifications include: (1) eliminating the collective satisfaction of the twenty-hour requirement; (2) expanding the definition of pro bono services to include services to the poor which are not strictly legal in nature; and (3) eliminating the reporting requirement, primarily because of administrative costs.
The original petitioners generally approve the Commission's plan; however, they suggest that: (1) standards for pro bono services should be increased to fifty hours; (2) in lieu of the alternative payment of $350, an hourly rate of thirty dollars for all hours not performed should be charged; and (3) rather than having the chief judge of each circuit file his or her report with The Florida Bar, the reports should be filed with the Supreme Court, with The Florida Bar having an opportunity to file commentary. In response to The Florida Bar's suggestion that reporting not be required, Petitioners believe "the reporting requirement lies at the heart of this joint commission proposal" and state that the Commission's suggested format is reasonable and should be implemented. Petitioners emphasize that the automatic review aspect of the report is important to allow the Court to directly assess the availability of legal services to the poor after this plan has been implemented. Similarly, the Projects Directors' Association, representing Legal Services Offices, recommends forty-eight hours per year as the pro bono standard and a thirty-dollar-perhour opt-out provision.
Other responses oppose the Commission's recommendations. Professor Joseph Little asserts that the Commission's report includes no study designed to make a defensible investigation of the true dimensions of unmet legal needs of the poor; that the $350 opt-out plan is unconstitutional because it would be a tax; and that the judiciary should not be the chief planner and implementer in providing a legal services program. Harvey M. Alper objects to any activity by the Court in this particular area and asserts that charity by definition cannot be compelled and that the adoption of this plan will destroy more than it will generate in services to the poor. Jerry A. DeVane believes that the proposed minimum standards of voluntary pro bono service make such service mandatory. He also objects to lawyers being able to collectively satisfy their pro bono requirement. Henry Trawick asserts that the Commission's report is based on assumption, hearsay, and inadequate investigation, and that this Court is not vested with jurisdiction to provide for the general welfare.
All recognize that this is not a problem with a simple solution, but, as we previously have found, a solution is necessary if our justice system is to be accessible for all segments of society. It is extremely important for all to understand the unique and important role of the legal profession in this country in protecting individual rights. The role of lawyers in this country is very different from that of lawyers in most countries of the world. Our legal system is different because we have a means to challenge the constitutionality of government actions and government conduct, as well as the conduct of individuals and entities. There is no constitution in Great Britain, and neither a barrister nor a solicitor can challenge a parliamentary act. The ability to challenge government conduct in France is also limited, and the means for an individual to challenge a legislatively adopted act as unconstitutional is nonexistent.
Courts are created (1) to enforce the laws and (2) to resolve disputes. Courts in the American legal system have a third distinct *43 and extremely important responsibility; that is to safeguard the Constitution and protect individual rights. The Federalist No. 78 (Alexander Hamilton). What makes our legal system so different is the ability of lawyers to challenge the constitutionality of government conduct before a separate, independent judicial branch of government. Although an independent judiciary is essential, an independent legal profession plays a critical role in maintaining our constitutional structure. It is the lawyers who bring cases before a court and advocate issues which assure the integrity of the Constitution and protect individual rights in our society. The availability of lawyers to challenge government conduct that interferes with constitutional rights is essential to assure that these rights are protected.
The need for legal representation has increased in recent years for several reasons. First, during the last fifty years, there has been a great increase in legislation and government regulation resulting in a substantial increase in the amount of government involvement in individual lives and business entities. This, in turn, has produced an increased use of the legal system, requiring legal representation by all segments of society. Second, there has been a major change concerning the right to counsel in criminal cases made by the United States Supreme Court.[3] In addition, the right to counsel is no longer limited to criminal cases; there is also a right to counsel for indigent parents where permanent termination of child custody may occur.[4] Furthermore, the Commission identified the under-represented groups which exist in our society. These include the institutionalized mentally ill and developmentally disabled, inmates of federal, state, and local prisons and jails, residential nursing homes and congregate living facilities, migrants, elderly, children, immigrants, homeless, AIDS patients, etc. Clearly, the legal needs for individuals have changed dramatically in the past fifty years.
Lawyer pro bono representation is not the absolute solution to the problem of indigent representation. As we expressed in In re D.B., 385 So.2d 83 (Fla. 1980), when the United States Supreme Court made changes concerning the right to counsel, it did not intend for the legal profession to absorb and be responsible for all indigent representation. In this new era, a balance must be achieved between the government and the legal profession in providing this representation. We find it is important for an independent legal profession to provide a portion of indigent representation to ensure proper challenges against government violations of individual rights. If lawyers were always paid by the government in indigent representation cases, they would be constantly challenging the entity that paid them. That relationship could eventually intimidate those lawyers in pursuing certain actions. In our system of government, lawyers must be independent in order to assure protection of constitutional rights. A solution that provides some indigent representation that is paid by the government and some that is pro bono should accomplish this objective.
The report of the Commission is extensive and recognizes the depth of the problem and the conflicting philosophies in achieving a solution. We find that the Commission has presented us with an appropriate starting point to resolve the legal needs of the poor, and we approve recommendation No. 24, with certain modifications.
First, the Commission's definition of what constitutes pro bono service is narrow to assure as much participation as possible in the performance of "legal" services. The board of governors, on the other hand, *44 suggests broadening the definition to include other services performed by lawyers that aid the poor. We support the position of the Commission and its narrow definition of pro bono service. We recognize that there may be limitations on what governmental lawyers and judges may be permitted to do because of constitutional, statutory, and other ethical restrictions, but we find that these problems should be addressed in the implementing rules.
Second, we agree with the board of governors that lawyers should not be encouraged to satisfy their pro bono obligation collectively. We accept the board's reasoning that this would allow large law firms to assign all the law firm's pro bono obligations to young associates, while sole practitioners would be required to accept the responsibility individually. While we reject generally the collective satisfaction of pro bono obligations, we find there needs to be an exception that provides sufficient flexibility to allow law firms to collectively satisfy their pro bono obligations when representing a pro bono client in a major case involving a substantial expenditure of time and resources, e.g., representation of a death-penalty defendant in a collateral review proceeding[5] and class action cases, as well as receiving credit for having a full time community or public service staff.
Third, we agree with the Commission that, in order to evaluate the effectiveness of local government plans for pro bono services, a reporting scheme is necessary. While we acknowledge there is a need to avoid large scale administrative costs, we find that some basic information is necessary in order to properly evaluate the effectiveness of pro bono services and this information should be furnished to the Court with the aid of The Florida Bar.
To implement recommendation No. 24, as modified, we conclude that the Commission should be designated as the body to prepare proposed rules to implement this decision. The Commission should present proposed rules to this Court on or before September 1, 1992.
In writing these rules, we find that each circuit must be given discretion to develop the means to provide these services in its respective jurisdiction. Accordingly, the rules must provide a means for each circuit to create an entity to determine (1) its particular needs; (2) the possible resources available to meet those needs; and (3) a short-term and a long-term plan to fulfill the legal profession's obligation to its community. We expect that the needs and resources available will be substantially different from circuit to circuit and, consequently, that the plans will not be similar. What is important is that a plan be developed to meet the special needs of each community.
To the legislature, we emphasize that the legal profession is not able to single-handedly resolve the problem of indigent legal representation, and, although there is a budget crisis, funding will eventually have to be provided to address a significant portion of the needs identified by the Commission and particularly legal representation that is now mandated by the Constitution.
For the reasons expressed, we approve the Commission's recommendations concerning legal services to the poor, as modified, and direct that, on or before September 1, 1992, the Commission submit implementing rules for the Court's consideration.
It is so ordered.
SHAW, C.J. and HARDING, J., concur.
McDONALD and GRIMES, JJ., dissent with opinions to the Reporting Requirement, and concur to other parts of the majority.
BARKETT and KOGAN, JJ., dissent with opinions to the majority opinion not *45 mandating Pro Bono Service, but concur with the remaining parts of the majority opinion.

APPENDIX I

VII. SUMMARY OF FINDINGS AND RECOMMENDATIONS

A. Needs and Resources
Finding: Legal needs of the poor, both generally and special need groups, far exceed the presently available and anticipated resources to meet such needs. While increased funds from the IOTA program will help to improve the quality and quantity of legal services, such funds will not substantially bridge the gap between needs and resources. A significant societal response is needed to seriously address this problem.
Finding: Pro bono legal services are an important part of the delivery of legal services to the poor and additional pro bono legal services can and should be contributed by Florida lawyers.
Recommendation No. 1: Generally, United Way funding for legal assistance to the poor is inadequate and should be increased, particularly in those areas in which no or only nominal levels of such funding have been made available.
Recommendation No. 2: Generally, funding from Area Agencies on Aging for the delivery of legal services to the elderly is inadequate and should be increased.
Recommendation No. 3: Court filing fee surcharges are an important resource for the delivery of legal services to the poor. In those counties in which no such surcharge exists or there is only a nominal surcharge, action should then be taken by local government officials to enact or increase such a surcharge.
Recommendation No. 4: State funding for the delivery of legal services to the poor should be made available.
Recommendation No. 5: The Florida Bar Foundation should adopt policies insuring that at least 85% of the IOTA funds are allocated to the delivery of legal services to the poor and distribute a higher proportion of those funds among the counties on a poor population per capita basis.
Recommendation No. 6: Congress should significantly increase federal funds for the delivery of legal services to the poor, and concerted efforts by bar groups and leaders and political leaders in Florida should be undertaken to accomplish such an increase.
Recommendation No. 7: Local governments should provide funding for the delivery of legal services to the poor in their general budgets.
Recommendation No. 8: Clients are an important resource to legal assistance providers and providers should seek to make further utilization of clients in the delivery system.
Recommendation No. 9: New sources of funding should be developed to meet the legal needs of special groups of the poor, such as children, mentally ill, migrants, developmentally disabled, elderly, prisoners, etc., and The Florida Bar Foundation should continue to address this area.
Recommendation No. 10: Florida should enact a public interest attorney fee statute.
Recommendation No. 11: Other professional groups who have supportive roles in the delivery of legal services to the poor should create and expand pro bono service programs.
Recommendation No. 12: Legal services providers should expand the utilization of community volunteers in their programs.

B. Services and Priorities
Finding: During the last decade inadequate overall funding, reduced federal funding, increased bureaucratic burdens and barriers imposed by the Legal Services Corporation and the loss of experienced legal services staff have adversely affected legal services to the poor by deterring and preventing: expansion of such services; programs from undertaking adequate levels of litigation and impact representation; development of innovative clinical service techniques; and the use of systemic strategies to address the needs of special needs clients. Increased IOTA funding from the *46 Florida Bar Foundation should be used to address these adverse effects.
Recommendation No. 13: Legal services providers should utilize all legal strategies to meet the needs of clients and The Florida Bar Foundation should support and encourage providers to do so.
Recommendation No. 14: Client needs assessment and case priorities should be set on a local program level based upon written policies, with participation and involvement from the general and client community and with cooperation among all legal services providers in the same locality.
Recommendation No. 15: Local program case choices should not be affected by the identity of a particular client or defendant or the controversial or unpopular nature of a particular matter or remedy.
Recommendation No. 16: Legal services providers should seek to provide full, aggressive representation to clients and to achieve an appropriate balance of services, which balance should be monitored and evaluated by The Florida Bar Foundation.
Recommendation No. 17: Innovative client service techniques should be explored and developed and the efficiency and effectiveness of client service techniques should be evaluated.
Recommendation No. 18: The Florida Bar Foundation should encourage and support the provision of legal services, including systemic strategies, to special needs clients by existing providers and through special projects when it is not feasible to do so through existing providers.
Recommendation No. 19: Florida Legal Services should be utilized as the resource center for clients and legal services providers, and separate resource center capacity should not be established unless client or legal services providers needs dictate otherwise and unless incorporation within Florida Legal Services responsibilities is not feasible.
Recommendation No. 20: Legislative or administrative restrictions on the types of cases which can be handled and the manner in which clients are represented by legal services providers should not be enacted and should be opposed by legal groups and bar leaders.
Recommendation No. 21: Legal services providers should cooperate in the delivery of services through participation in statewide work groups and through other avenues and such cooperation should be encouraged by The Florida Bar Foundation.
Recommendation No. 22: The Florida Bar should support: simplification of the guardianship statutes to provide greater access to those persons with little or no income and assets; further simplification and expansion of the application of simplified dissolution of marriage laws and procedures; and development of remedies for the abuse of case settlement offers requiring waiver of attorneys' fees.

C. Legal Services Delivery System
Recommendation No. 23: Staffed legal services providers are the core of the legal services delivery system and should receive highest funding priority.
Recommendation No. 24: A voluntary pro bono legal services plan should be established and should provide for (a) a wide range of support and service activities for volunteer attorneys; (b) a minimum individual attorney standard of 20 hours of voluntary pro bono legal services which can be collectively met under certain circumstances, an alternative financial contribution to a legal services provider of $350.00; (c) a definition of qualified pro bono services that insures the legal services will directly impact on the availability of legal services to the poor or affect conditions of poverty; (d) local community responsibility and control for development and implementation of such plans; (e) the inclusion of all lawyers within the plan to the extent legally and practically feasible; (f) additional resources to support the plan; (g) accountability on individual, judicial circuit and statewide levels; (h) evaluation and review of the effectiveness of the plan.
Recommendation No. 25: State support activities provided through Florida Legal Services should be strengthened and expanded *47 to insure inclusion of all legal services providers.
Recommendation No. 26: The Florida Bar Foundation should encourage the expansion of existing legal services providers and further cooperation, including possible joint venturing and consolidation of multiple programs in a local service area.
Recommendation No. 27: The Florida Bar Foundation should further develop and implement a monitoring/evaluation program to enhance client services, encourage improvement of program performance and insure program compliance with grant terms.
Recommendation No. 28: The Florida Bar Foundation should examine the technological and other physical needs of legal services providers and set aside funds to address such needs.
Recommendation No. 29: The Florida Bar Foundation and legal services providers should work together to improve local board effectiveness and the effective utilization of local client board members.
Recommendation No. 30: The Florida Bar should study and consider the feasibility of (1) licensing legal technicians to perform some legal tasks; (2) creating administrative processes as alternatives to court access and attorney assistance; (3) expanding the availability of alternative dispute resolution; (4) establishing additional programs having no fee, low fee and sliding fee scales; (5) establishing public interest law firms; (6) expanding the applicability of small claims rules to cases involving more than $2,500.00.
Recommendation No. 31: The Florida Bar Foundation, Florida Legal Services and legal services providers need to improve the recruitment, retention and development of legal services attorneys through salary enhancement, cooperative recruiting efforts and further implementation of ongoing professional development activities.

APPENDIX II
Recommendation No. 24, Voluntary Pro Bono Legal Services
IT IS RECOMMENDED THAT a statewide voluntary pro bono legal assistance plan be established and implemented based upon the following elements:
1. Pro bono programs and legal services providers should, to the extent feasible, encourage lawyers to provide voluntary pro bono legal services to eligible clients by and through: a) providing intake, screening and referral of prospective clients; b) matching cases with individual attorney expertise, including the establishment of specialized panels; c) providing resources for litigation and out-of-pocket expenses for pro bono cases; d) providing training and legal consultation for pro bono attorneys; e) providing malpractice insurance on pro bono cases; f) establishing procedures to insure adequate monitoring and follow-up for assigned cases and to measure client satisfaction; and g) recognition of pro bono services by lawyers.
2. Pro bono programs and legal services providers should, to the extent feasible, offer lawyers a variety of opportunities through which their voluntary pro bono legal services standard can be met. These opportunities should include but are not limited to: a) representation of clients through case referral; b) intake of clients; c) advice and counsel clinics; d) co-counseling; e) case review and evaluation; f) policy advocacy; g) training programs for providers and pro bono attorneys; h) community legal education; i) research; and j) guardian ad litem services.
3. Rules Regulating The Florida Bar, Sec. 4-6.1, be amended to establish a minimum standard of twenty (20) hours of voluntary pro bono legal services per attorney per year. Lawyers in firms or other recognized groups and individual lawyers not otherwise associated may collectively satisfy the standard. For individual lawyers who are not in a firm or in another recognized group to collectively satisfy the voluntary pro bono legal services standard, such individual lawyers must annually indicate their intention to associate for such purpose in advance, at the time of submission of The Florida Bar dues form. In the event more than forty (40) hours of voluntary *48 pro bono legal services are provided in any one year, the excess hours over forty (40) may be credited toward two successive years.
4. Rules Regulating The Florida Bar, Sec. 4-6.1, be amended to provide that as an alternative a lawyer may satisfy the voluntary pro bono legal services standard by making a contribution of $350.00 to an approved civil legal aid organization under Chapter 11, 12 or 13 of the Rules.
5. Rules Regulating The Florida Bar, Sec. 4-6.1, be amended to provide a definition of qualified voluntary pro bono legal services as:
a) Handling without charge or expectation of a fee civil matters for persons with income at or below 125% of the federal poverty standard, as adjusted annually, and handling without charge criminal matters for such persons in which there is no constitutional obligation to provide funds for representation; and b) Free legal services to charitable, religious, civic and educational organizations in matters which are designed predominantly to address the needs of poor persons.
6. Rules Regulating The Florida Bar, Sec. 4-6.1, be amended to provide that the voluntary standard of pro bono legal services applies to all lawyers, except for retired or inactive status members of The Florida Bar, or those precluded from practicing due to illness. Some members of The Florida Bar, particularly judges and government attorneys, may be subject to ethical, administrative or statutory restrictions which bar or diminish their ability to meet the voluntary pro bono standards of this plan. Authorities imposing such restrictions should review and amend any such restrictions to the extent possible to enable all lawyers to fulfill the voluntary pro bono standards of this plan. In any event this plan does not anticipate that members of The Florida Bar would be expected to perform voluntary pro bono legal services which would violate any such ethical, administrative or statutory restrictions.
7. Establishment of a uniform statistical and information gathering system to measure pro bono activity and results on individual attorney, county, judicial circuit and statewide levels on an annual basis and to determine the cost of operation of the pro bono plan. Such uniform statistical and information gathering system should be designed to measure the extent to which the pro bono program and voluntary individual attorney standards of this plan have been accomplished.
8. The Florida Supreme Court to require the establishment of local pro bono committees on a judicial circuit level to plan and develop and administer voluntary pro bono legal services plans in accordance with these elements, to establish implementation plans and to evaluate and monitor the activity, results, and cost of the voluntary pro bono legal services plans. The Chief Judge of each judicial circuit shall appoint and convene the pro bono committee which shall be composed of the Chief Judge, or designee, and representatives of local bar associations, pro bono providers and legal services providers in the circuit. Each pro bono committee shall appoint one lay person and, at least, one client eligible person to serve on the committee. Each committee shall make an annual report to The Florida Bar on the status, results, and cost of operation of its pro bono plan.
9. Current legal services providers and pro bono entities in place shall be utilized to implement the local voluntary pro bono legal services plans and to provide coordination and administrative support for pro bono committees unless not feasible.
10. The Florida Bar shall designate a standing Board of Governors committee to review and evaluate local pro bono plans, activity and results in accordance with the standards outlined herein, to provide technical assistance to local pro bono committees, pro bono providers and legal services providers and to make an annual report to The Florida Bar Board of Governors. The Florida Bar shall make annual recommendations concerning the pro bono plan to the Florida Supreme Court and The Florida Bar Foundation. Such committee should be adequately funded and staffed by The Florida Bar.
*49 11. The Florida Bar and The Florida Bar Foundation should take steps to insure that adequate financial support is provided to support the implementation of the voluntary pro bono legal services system recommended in these elements. Recognizing that legal aid to indigents is a societal as well as a legal problem, The Florida Bar, The Florida Bar Foundation and Florida Legal Services, to the extent permitted by law, shall annually petition, as a legislative priority, the Florida legislature for financial support for legal services.
12. The Florida Bar should, to the extent feasible, incorporate into their education and training programs material and information about voluntary pro bono legal services and representation of the poor.
13. As a part of and simultaneously with the filing of the annual Florida Bar dues form, each lawyer shall report whether or not the lawyer has performed pro bono legal services or made a monetary contribution as defined by this plan. Further, each lawyer who has performed or attempted to perform such services or made such contribution shall indicate the number of voluntary pro bono legal services hours performed or the monetary amount contributed; whether such hours performed were performed through a collective plan; and whether hours performed were through an organized pro bono program or through the lawyer's practice. In the event the lawyer volunteered to provide pro bono legal services through an organized program, but the lawyer's services were underutilized or not utilized, then such fact should be indicated on the report. Annually, The Florida Bar shall report to the Florida Supreme Court, The Florida Bar Foundation, Florida Legal Services and each judicial circuit committee, a statewide and circuit-by-circuit statistical summary of the data collected and shall provide each judicial circuit committee the data reported by each lawyer in that circuit. A suggested form of a report, which can be incorporated within or included as a part of The Florida Bar dues form, is attached as Appendix 27.
14. Two (2) years after the implementation of this voluntary pro bono legal services plan, the Florida Supreme Court should review the results and make a determination as to the effectiveness of the plan.
Comments: The Joint Commission's plan for voluntary pro bono legal services is based upon a strong belief that pro bono services by lawyers can and should play a much larger role in providing legal services to the poor. While recognizing that the current effort in pro bono services by lawyers in Florida is insufficient, the Joint Commission is not convinced that the solution is to impose a mandatory pro bono legal services program upon Florida lawyers.
The debate over mandatory versus voluntary pro bono has produced a voluminous record of law review articles, general legal publication articles and studies throughout the country. The debate and accompanying material has illustrated the potential divisiveness of the issue within the legal profession. Primarily, the proponents of mandatory pro bono point out that the record of voluntary pro bono clearly demonstrates that it produces a grossly inadequate response to the needs of the poor for legal assistance. Mandatory pro bono advocates also decry the basic unfairness of a voluntary system in which the pro bono burden falls on a relatively small percentage of the lawyers (usually 20 to 30%), while a large majority of lawyers remain uninvolved. Further, they contend that the provision of legal assistance to the poor should be viewed as a professional imperative for lawyers rather than an aspirational goal.
On the other side, proponents of voluntary pro bono legal services point out both the philosophical opposition to mandating the performance of free legal services and considerable administrative and practical problems in developing and implementing mandatory pro bono, such as accountability, enforcement, etc. They contend that the prolonged and bitter debate in the legal profession, and expected lengthy legal challenges, over mandatory pro bono would distract the *50 attention and enfeeble the efforts of the legal profession to address the basic problem of the unmet legal needs of the poor. Further, mandatory opponents contend mandatory pro bono may not produce the quantity or quality of services which would justify the costs of operation of a mandatory system.
The debate over mandatory pro bono in Florida has sounded similar themes. As early as 1970, The Florida Bar and the University of Florida Law School cosponsored a study of legal services for the poor. The study, commonly referred to as the "Levinson Report", recommended that pro bono services be encouraged and that a guideline setting an appropriate level of pro bono work be established.
In 1979, The Florida Bar, following a directive of the Florida Supreme Court emanating from an unauthorized practice of law case, contracted with the Center of Governmental Responsibility of the University of Florida's Holland Law Center to "determine better ways and means of providing legal services to the indigent." That report, submitted to The Florida Bar in January of 1980, recommended implementation of a pro bono plan similar to the Orange County Bar Association pro bono plan which requires members of that voluntary bar association to handle two pro bono cases per year or pay $250.00 for support of the Legal Aid Society of Orange County.
In 1983, the Florida Supreme Court, in response to a petition filed by 60 lawyers requesting establishment of a mandatory pro bono program or a mandatory IOTA program, refused to adopt mandatory pro bono. In its opinion, the Court emphasized the importance and worthiness of the professional directives that all lawyers should serve the disadvantaged but declined to mandatorily enforce such directives.
In 1985 The Florida Bar's Special Commission on Access to the Legal System recommended that the directive rule of pro bono services be converted to a mandatory rule.
In 1989 the D'Alemberte Petition, filed by 58 lawyers, requested the Florida Supreme Court to establish a pro bono services plan by which judges would appoint lawyers to represent indigents. On May 11, 1990, the Court heard oral argument on the D'Alemberte Petition, including presentations by Mr. D'Alemberte and several opposing parties. In its landmark decision of December 1990, the Florida Supreme Court held:
"We hold that every lawyer of this state who is a member of The Florida Bar has an obligation to represent the poor when called upon by the courts and that each lawyer has agreed to that commitment when admitted to practice law in this state. Pro bono is a part of a lawyer's public responsibility as an officer of the court."
In the course of reaching this holding the Court found that constitutional objections of involuntary servitude and taking of property without compensation are without merit. The Court stopped short of amending any Rules Regulating The Florida Bar and implementing any pro bono plan, preferring to have an opportunity to consider the Joint Commission's recommendations, which the Court requested be filed by February 1, 1991. To put the mandatory-voluntary debate in some perspective, no state has *51 adopted a mandatory pro bono plan. Several state bar committees, commissions and study groups have recommended statewide mandatory pro bono, however, no state bar associations have supported such plans. There are a number of voluntary, local bar associations, including several in Florida, which require their members to participate in pro bono programs. There are several court-appointment pro bono programs in the U.S., however these are generally limited in scope, geographically (mostly affecting one county or judicial circuit), types of cases (landlord-tenant, family law) and lawyers affected (usually only the lawyers appearing in court and handling similar matters). Also, no state has adopted a statewide voluntary pro bono plan that specifies standards for the expected performance of pro bono services by lawyers. This scenario could change at any time since mandatory and specific voluntary plans are being actively considered and/or studied in several states. In deciding not to recommend a mandatory pro bono plan, the Joint Commission did not do so because of legal arguments against such plans. In its December 1990 decision on the D'Alemberte Petition, the Florida Supreme Court has resolved such arguments and recognized that it has the authority to impose a mandatory plan.
The Joint Commission has chosen the voluntary plan it recommends over a mandatory plan for the following reasons:
1. The effort to adopt and implement a mandatory plan would be plagued by intractable bitter debate in the legal profession and prolonged legal challenges. This would dissipate and divert the energy and support needed from the legal profession for accomplishing expansion of pro bono services and other initiatives needed to improve and expand legal services to the poor. While the Joint Commission's specific voluntary plan will engender controversy and debate, the ferocity and length of that debate should not prevent or deter the legal profession from moving ahead to provide better and more legal services to the poor.
2. The costs and administrative difficulty in implementing and enforcing mandatory pro bono could well outweigh or at least greatly diminish the value of any increased legal service to the poor. The implementation of the Joint Commission's plan will require significant increases in funding, however those funds will go to improving and expanding services to indigent clients rather than initiating disciplinary action against recalcitrant lawyers.
3. The present state of statistical and other information about the extent and nature of pro bono services in Florida is incomplete. There has been no uniform system of reporting pro bono activities and services in Florida. Implementation of the Joint Commission's plan will establish such a system and enable all interested parties to more thoroughly evaluate pro bono services and provide a better basis upon which to determine the feasibility and worth of mandatory or voluntary plans and other alternatives.
4. While the current level of pro bono services in Florida is severely inadequate, it should be recognized that in the last ten years there has, nevertheless, been a very significant increase in the number of pro bono programs and participating attorneys. Adoption of the Joint Commission's plan should provide a much needed impetus to marshal significantly more pro bono services for the poor. While no voluntary plan can hold out the 100% participation "promise" of a mandatory plan, significant increases should be possible. With the adoption of statewide standards and the enhancement of the pro bono program capability to offer a variety of opportunities for pro bono service and offer additional support to pro bono attorneys, it is expected that there will be a significant increase in pro bono services. Also, the institution of uniform reporting systems and evaluation processes should contribute to the likelihood of such an increase. The national experience with voluntary pro bono programs indicates that the most successful programs are built upon all of these ingredients. The Joint Commission is impressed with the Orange County Bar Association plan. While it is mandatory for its voluntary members, its success seems to be built more on its underlying acceptance as a law practice norm or expectation rather than its mandatory nature. The Joint Commission's plan of specific expectations and the recognition of the need for improved pro bono program infrastructure should increase the possibility of replicating the success of this sense of legal community norm on a statewide level.
5. The Joint Commission's plan would for the first time establish goals and hold the legal profession accountable for its devotion and commitment to its aspirational pro bono standards. Imposition of a mandatory pro bono plan at this time would, in *52 the Joint Commission's view, prematurely conclude that a large majority of lawyers in Florida are irrefutably unwilling to support such standards.
In reaching its recommended voluntary pro bono plan, the Joint Commission also considered the "pro bono plans" recommended by the D'Alemberte Petition and the opposing responses. The Joint Commission feels that, while the D'Alemberte Petition has merit and has been critically instrumental in focusing the attention of the legal profession on this problem, a court appointment pro bono plan has several important weaknesses. First, fulfilling the profession's pro bono obligation primarily through court appointment of an individual lawyer would place an undue burden on the judiciary to handle pro bono services. Second, a court appointment plan would not address the great need for non-court litigative representation of the poor. Third, it would not apply evenly to all members of the profession.
On the other hand, the plan filed in opposition to the D'Alemberte Petition lacks sufficient direction and detail to determine whether that plan recognizes the need for increased legal services for the poor or would result in any improvement or expansion of such services. The Joint Commission's plan does not propose court appointment of lawyers as a means of fulfilling the pro bono obligation, however, the Joint Commission's plan does incorporate some of the ideas of the D'Alemberte Petition and the opposing response in the area of formation of circuit committees to develop and implement local voluntary pro bono legal services plans.
The Joint Commission's plan is designed to:
1. Provide an open-ended opportunity to all Florida lawyers to assist in the delivery of legal assistance to the poor and provide all lawyer participants the support and backup necessary to exercise such opportunity (see Sections 1 and 2 of the plan).
2. Establish a voluntary minimum standard of level of participation that would significantly increase the availability of legal assistance to the poor and yet not be burdensome on lawyers (see Sections 3 and 4 of the plan).
3. Establish a definition of qualifying voluntary pro bono legal services that insures that increased pro bono activity contemplated by the plan will inure to the benefit of the poor (see Section 5 of the plan), in both civil and criminal arenas.
4. Insure that the voluntary pro bono legal services plan applies fairly to all lawyers by limiting lawyer exclusions (see Section 6 of the plan).
5. Establish a pro bono system that is measurable and accountable, is sensitive to local community needs and solutions and utilizes existing community structures (see Sections 7, 8 and 9 of the plan).
6. Provide a statewide system of support and evaluation (see Sections 10, 11 and 12 of the plan).
7. Require individual lawyer accountability (see Section 13 of the plan).
8. Require an evaluation of the plan and its implementation (see Section 14 of the plan).
In developing the recommended voluntary plan, the Joint Commission considered a number of different options in the important areas of defining the voluntary pro bono legal services standard amount, defining the services which qualify, determining which lawyers are covered and establishing a reporting system:
1. Section 3 of plan. The Joint Commission considered whether the voluntary pro bono standard should be set out in hours or in number of cases. It chose hours because the standard then has a more even application. The choice of case numbers could lead to a very disparate expectation and contribution on the part of participating attorneys. The minimum hours standard is not intended to convey the idea that once the minimum hours obligation is satisfied, a pro bono attorney may drop a pro bono case in progress. Other professional dictates would clearly bar such a practice. Moreover, the Joint Commission's plan provides a mechanism for future crediting of excess hours contributed in any one year. *53 Also, the use of a hours contributed standard allows a precise standard for non-case handling pro bono activities in which pro bono attorneys will likely be involved.
The provision for collective satisfaction of the pro bono standard is considered by the Joint Commission as a means to encourage particularly law firms to undertake substantial legal matters on behalf of the poor through the pooling of their members' obligations. As a matter of fairness, this is also available to individual attorneys who affirmatively decide in advance that they wish to associate with others for this purpose.
The standard of 20 hours per year is on the low side of most plans which have been discussed or recommended in other states. The Joint Commission feels that this standard could produce a very significant increase in pro bono services while not being burdensome. The Joint Commission feels that setting a high standard may well result in the development of less total pro bono hours because it would discourage lawyers from participating. The standard is, of course, a minimum standard. The Joint Commission acknowledges that many attorneys regularly contribute hours far in excess of the minimum and wishes to encourage such laudable devotion and commitment.
2. Section 4 of plan. In providing for an optional contribution of $350.00 in lieu of contributing 20 hours of pro bono services, the Joint Commission recognizes that some feel that a dollar "buy-out" is demeaning to the professional obligation of actually serving the poor. However, the Joint Commission feels that regardless of the creation of a variety of ways by which lawyers can contribute their time, there will remain for many lawyers and pro bono programs substantial practical difficulties in utilizing their services. Also the Joint Commission recognizes, based upon the experiences of local pro bono programs that provide for a buy-out, that such dollar contributions can be utilized by legal services providers to significantly expand the delivery of legal services to the poor, the primary goal of the Joint Commission's plan. The Joint Commission considered higher "buy-out" amounts based upon some correlation with the billable hour value of 20 hours of pro bono services. It concluded that because the Joint Commission's pro bono plan is a voluntary plan, the amount should not be so high as to discourage lawyers from voluntarily contributing.
3. Section 5 of plan. The definition of services which qualify for meeting the voluntary pro bono legal services standard is narrowly drawn to insure that the pro bono services expected will have a direct impact on the unmet legal needs of the poor or alleviate conditions of poverty. In requiring that a pro bono case must be handled "without charge or expectation of a fee", the Joint Commission intends to exclude as pro bono cases, matters handled on a contingency fee basis where a fee is reasonably expected by the attorney. The Joint Commission does not intend to exclude as a pro bono case, matters with respect to which a contracted or statutory fee is possible, but could not reasonably be expected at the time the case is accepted by the lawyer. As an officer of the court, a lawyer has a unique and special role and responsibility in assisting those persons unable to gain access to legal assistance and the courts. This special role and responsibility has been recognized historically and emphatically confirmed by The Florida Supreme Court in its December 13, 1990 decision on the D'Alemberte petition. While the Joint Commission recognizes and applauds the many and substantial general community services provided by lawyers, it has concluded that the minimum standard of this plan should be met only by those activities which will directly address the problem of the unmet legal needs of the poor or alleviate conditions of poverty.
4. Section 6 of plan. The Joint Commission considered whether groups of lawyers, such as judges, government attorneys, legal services attorneys and others should be excluded from the expectations of the plan. Such groups for various reasons can provide valid reasons why they should be excluded. However, the present voluntary directive does not exclude such groups. *54 Also the Joint Commission's plan envisions a wide variety of means by which lawyers can meet their voluntary pro bono standard, thus diminishing the need for exclusions. Fairness to all lawyers dictates that exclusions be severely limited. The Joint Commission recognizes that pro bono legal services should not be regarded as the panacea for the problem of providing legal services to the poor. Pro bono legal services should be viewed as only one component in an array of strategies to improve and expand the delivery of legal services to the poor. The Joint Commission believes its plan maintains and promotes this perspective and recognizes that while the legal profession must increase its effort to address this problem, society as a whole must also respond. It also believes the plan, if adopted and successfully implemented, would provide a significant direct increase in the delivery of legal services to the poor, while at the same time, encourages the legal profession to be otherwise active and supportive in developing and promoting other efforts to bridge the gap between the poor's need for legal assistance and Florida's ability to meet such needs.
5. Section 13 of the plan. The Joint Commission considered whether to establish an individual lawyer reporting system which requested or required lawyers to report their participation in the provision of pro bono legal services defined by the Joint Commission (whether by services or monetary contribution). The Joint Commission concluded that, though participation in the plan is voluntary, lawyers should be required to report whether or not they participated and other information about their participation or attempted participation in order to establish a sound statistical basis upon which to gauge the results obtained under the plan and the weaknesses and strengths of the design of the plan and its implementation.
McDONALD, Justice, concurring in part, dissenting in part.
Because the opinion suggests the need for implementing rules, I publish some of my views that clearly conflict with those of Justices Kogan and Barkett. My position on pro bono services has been, and remains, that except in exceptional cases, all lawyers should participate in providing legal services for those in need of them who cannot secure them. I also believe, however, that a lawyer should not be mandated directly, or indirectly, to perform free legal services if he or she is not inclined to do so. We can and should point out the needs and opportunities of such service; we can request, exhort, and even pique one's consciousness, but we should not dictate involuntary participation. Even though it is not an admirable course of conduct, if lawyers want to use their talents in a selfish and miserly manner, I believe they have that right.
I do not believe that it should be an ethical violation for a lawyer to decline to participate in a pro bono plan. Thus, if rule 4-6.1 should be amended, we should make it clear that we are only designating aspirational goals and, by placing these aspirational goals in our rules, not making such service mandatory. Neither do I believe that lawyers should be required to report whether they participate, or the extent of their participation, in pro bono services.
I agree with the majority that in no situation should we be discussing anything more than providing pure legal services. Whether a goal or a requirement is set, it should be fulfilled only by performing those services that only lawyers have the right and license to perform.
I commend the Commission and, except as described above, also approve its report.
GRIMES, Justice, concurring in part, dissenting in part.
I continue to fully support the voluntary providing of pro bono legal services. However, I share the view of Justice McDonald that this Court should not impose a mandatory pro bono obligation upon the lawyers of Florida. In any event, it should be noted that neither the original petitioners nor the Joint Commission has recommended the adoption of a mandatory pro bono program.
*55 I concur in all aspects of Justice Overton's opinion except the reporting requirement. I can envision circumstances where the accumulated data could be used to try to embarrass lawyers into doing something they have a right to refuse to do. In this regard, I agree with the position taken by the Board of Governors of The Florida Bar:
The Bar submits that if the plan is truly voluntary, there is no good reason to compel lawyers to report their personal pro bono practices to The Florida Bar via the annual dues form. Such a mandatory reporting requirement lends a coerciveness to the plan which is overbearing and unnecessary. Certainly adequate statistical information can be obtained from existing pro bono programs and legal service providers as well as the local pro bono committees (once they are established) upon which to gauge the strengths and weaknesses of the voluntary pro bono plan. The Joint Commission has endeavored to structure a pro bono system that "is sensitive to local community needs and solutions and utilizes existing community structures." (Joint Commission Report p. 45) The crux of the Joint Commission's voluntary plan is the establishment of local pro bono committees to develop and administer voluntary pro bono legal services plans and to evaluate and monitor the activity, results and cost of the voluntary pro bono legal services plans. The local pro bono committee will be in the best position to measure pro bono activity. It would be inefficient and costly to duplicate the statistical gathering system at the state level through the establishment of an individual mandatory reporting requirement. Accordingly, the Bar recommends that paragraph 13 of Recommendation No. 24 be deleted.
The Florida Bar's Response to the Report of the Joint Commission at 6-7.
BARKETT, Justice, concurring in part, dissenting in part.
I agree with the majority opinion but would make minimal pro bono requirements mandatory. I would do so on the basis that the requirements of pro bono services derive from the status of lawyers as officers of the court and from the exclusive nature of the franchise they hold. I do not perceive the requirement as deriving from a moral obligation to "do good." As much as I would like to harness the tremendous energy and resources of lawyers  individually and collectively  to address the social and economic ills of this country, I do not believe that can be mandated. I do believe, however, for all the reasons so eloquently stated by Justice Kogan, that mandating legal representation for the indigent in order to assure meaningful access to the courts can and should be.[6]
KOGAN, Justice, concurring in part, dissenting in part.
I agree with the majority opinion that there must be a reporting requirement even for voluntary pro bono services rendered by lawyers. I dissent, however, from the majority's failure to institute mandatory pro bono. The record before us today demonstrates compelling reasons why such a requirement now must be created and enforced.
Indeed, the pleadings and oral argument in this case are a fine example of the lawyer's craft. With great subtlety and a fine appreciation of legal nuance, the parties have demonstrated once again the exacting level of skill required of this state's attorneys. Yet, the very fact that such skill is required  that the parties to this cause have had to devote professional services worth many thousands of dollars  poignantly demonstrates the need for an expanded pro bono obligation within The Florida Bar.
*56 In a very real sense, the present case involves many more people than just the privileged group of lawyers, legal scholars, and Bar officers who actually prepared and argued this cause. The people most seriously affected by this Court's actions today are precisely the ones who were not present  the people who can least afford an attorney and thus can ill afford to appear before us to argue their side of this issue. These are the people that, because of the economic realities of our legal system, effectively have been excluded from the same level of legal services available to the more affluent residents of Florida.
These dispossessed people are everywhere in our society. They include the abused, neglected, or abandoned children who too often become mere pawns of a legal process they certainly lack the skills to comprehend.[7] They include the divorcing wife systematically denied a voice in a legal system that too often favors the divorcing husband's interests, because he too often is the one who holds the purse strings.[8] They include the impoverished minorities unable to find legal representation because they are unable to pay even the most minimal fees charged by lawyers. They include the elderly on fixed incomes who cannot afford the cost of the legal services they need  even simple services such as planning for illness or drafting a will. The dispossessed include the mentally and physically disabled, whose conditions often have stripped them of the wherewithal necessary to obtain legal advice.
There was a time in the early days of the American states when the law was not so complex as it is today and such people would not have been so seriously disadvantaged as they now are. In his trilogy, The Americans, Librarian of Congress Daniel J. Boorstin noted that it was common practice in the early days of this nation  the period that established most of the basic provisions of our present state and federal constitutions  for people to argue their own cases before the judge. The use of lawyers was not as commonplace as it is today, and our legal system was not dependent on the services of lawyers.
Indeed, in one of this nation's early legal codes, the Puritans of New England actually forbade the practice of law, preferring that people speak for themselves in court. The merchants of New York and the planters of Virginia distrusted the organized, monopolistic legal profession that existed in England, and they suppressed the development of anything similar in their territories. The Quakers of Pennsylvania attempted to avoid legal process altogether by using a system of lay "peacemakers" to mediate disputes. Daniel J. Boorstin, The Americans: The Colonial Experience, 195-97 (1958).
The United States Supreme Court itself has conducted a review of the history of the American judiciary and has reached similar conclusions:
When the Colonies were first settled, "the lawyer was synonymous with the cringing Attorneys-General and Solicitors-General of the Crown and the arbitrary Justices of the King's Court, all bent on the conviction of those who opposed the King's prerogatives, and twisting the law to secure convictions." This prejudice gained strength in the Colonies where "distrust of lawyers became an institution." Several Colonies prohibited pleading for hire in the 17th century. The prejudice persisted into the 18th century as "the lower classes came to identify lawyers with the upper class." The years of Revolution and Confederation saw an upsurge of antilawyer sentiment, a "sudden revival, after the War of the Revolution, of the old dislike and distrust of lawyers as a class." In the heat of these sentiments the Constitution was forged.
*57 Faretta v. California, 422 U.S. 806, 826-27, 95 S.Ct. 2525, 2537, 45 L.Ed.2d 562 (1975) (footnotes omitted).
Thus, in the formative years of our Republic, legalistic subtleties actually were frowned upon. Judges themselves typically lacked a formal training and thus were more impressed with common sense than legal nuance. Legal historians have noted, for example, that Florida's first chief justice, Thomas Douglas,[9] actually began his law career as a circuit court judge before he had completed his legal studies. Joseph A. Boyd, Jr. & Randall Reder, A History of the Florida Supreme Court, 35 U.Miami L.Rev. 1019, 1021-22 (1981). In any event, the statutes in those days were simple and few. Legal principles did not change rapidly, as they do today. Common law issues often were decided, not with the use of vast libraries and computer databases as they are today, but by looking to handy condensations such as Blackstone's Commentaries on the Laws of England. Boorstin, supra, at 195-202.
The law clearly was not beyond the reach of the average person, as it is today. Quoting Edmund Burke, Boorstin noted that early Americans of all walks considered themselves capable of becoming "amateur lawyers" in their own causes:
[Burke] saw the broad significance in this American dissolution of the lawyers' monopoly: such a citizenry would not allow itself to be oppressed.... With nothing more than the four volumes of the Commentaries at hand, anyone  however far from ancient professional centers, from courts or legislatures  could become an amateur lawyer.
Id. at 202. Indeed, in those days, the Bar remained largely unregulated. Shortly after Florida became a state, persons twentyone years of age or older could be admitted to the Bar simply by petitioning a local circuit court judge, presenting evidence of a good moral character, and passing whatever oral examination the court deemed appropriate to gauge capacity and fitness. This exam could be brief and was administered in open court. If the applicants passed, they immediately were sworn as lawyers. Fla.R.Practice (Circuit Courts) 1 & 2 (1845).
Today, it is hard to imagine a time when such simplicity existed in legal matters. Unskilled persons who attempt to argue their own cases in a modern courtroom are under the most serious handicap imaginable. Merely mastering the rules of evidence is an overwhelming task that typically takes law students several semesters of study, mock trial practice, and internship. Even then, years of active courtroom practice are needed before a lawyer truly can be considered a master of the evidence code. Yet evidence is only one small aspect of legal practice today.
In addition to such procedural concerns, parties representing themselves in court must master the principles of the substantive law itself. This becomes more difficult as time passes. Every year the Legislature and Congress meet again and pass still more laws of ever greater complexity. Under our common law system, every published court opinion makes new law, and relevant opinions thus must be located and analyzed. A party also must consult the regulation books, which cannot be skillfully done absent knowledge of the intricacies of the vast official bureaucracies. Laws proliferate at an excessive rate that often overwhelms even the most expert of attorneys. Our legal system has gone full-circle, since the law now is full of hairsplitting subtleties similar to those that existed in England at the time of the Revolution, against which the Colonies rebelled. See Faretta, 422 U.S. at 826-27, 95 S.Ct. at 2537.
This avalanche of laws now poses a very serious question to this Court. Under article I, section 21 of the Florida Constitution, the residents  all the residents  of this state are guaranteed access to the court "for redress of any injury." Art. I, § 21, Fla. Const. The wording of this provision has been changed only in style, not in substance, *58 since the Constitution that Florida adopted in 1845 upon being admitted to the Union. Compare id. with art. I, § 9, Fla. Const. (1845).
The framers of 1845, however, clearly lived in a world far more like the one described by Daniel Boorstin than what we see today. In 1845, it may have been enough that a person merely be allowed to come into court to make an argument. Indeed, the rules of court in existence in those days clearly contemplated that a circuit judge could appoint virtually anyone to be a lawyer. Fla.R.Practice (Circuit Courts) 1 & 2 (1845). The underlying assumption of such a rule was that the law was not so complex as to lie beyond the reach of the average person. This conclusion is only underscored by the fact that some judges, including Florida's first chief justice, served on the bench without the benefit of legal training, formal or informal. Boyd & Reder, supra, at 1021-22.
Today, the law no longer operates in this way. We ourselves implicitly have recognized this fact by mandating that a person cannot practice law in Florida without graduating from an accredited three-year graduate program of legal study, without also passing an exacting background investigation, and without then successfully completing a highly rigorous battery of tests that examine an applicant's mastery of all fields of the law as well as professional ethics. Applicants are tested even on such arcane topics as the common law of crimes developed in England during roughly the last thousand years, which for all practical purposes is a dead letter completely superseded by modern criminal codes.
While the physical courthouse doors remain open, this ever-increasing complexity in the law now has figuratively slammed those doors in the face of countless Floridians. Only those who can afford an attorney or who themselves are lawyers truly have unconstrained access to the powers of the courts, which are supposed to belong to all the people of this state. Art. I, § 1, Fla. Const.
I do not suggest that we must retreat to the world of 1845. Our society has become too complex to live by the simple codes of the frontier past, nor would we tolerate a legal system operated by persons who in the past often lacked legal training. But I do suggest that article I, section 21 of the Florida Constitution must be interpreted in light of the society that etched it into this state's fundamental law. To this society, "access to courts" meant a meaningful access to the state's legal process.
This Court's obligation, therefore, is to ensure that access is genuinely meaningful in today's world. Most importantly, I believe that article I, section 21 is a command to this Court to take every step necessary to make judicial resources available to all the residents of this state, insofar as we are able under the doctrine of separation of powers.[10] Art. II, § 3, Fla. Const.
One way this goal can be promoted is through this Court's constitutional authority to regulate the practice of law. Art. V, § 15, Fla. Const. Florida law is settled that attorneys are officers of the Court who are authorized to practice law as a privilege or franchise granted by this Court; and their obligation to the public is as significant as their obligation to individual clients. In re Clifton, 115 Fla. 168, 155 So. 324 (1934). Accord § 454.11, Fla. Stat. (1989) (lawyers are officers of the court). The franchise granted to attorneys is a conditional one, which this Court may regulate in the interests of the public and in harmony with the goals of the Florida Constitution. See In re Amendments to Rules Regulating The Florida Bar, 573 So.2d 800 (Fla. 1990).
Thus, this Court necessarily must examine how Florida lawyers are using the franchise *59 they have been granted by this Court  a franchise that, in the last analysis, belongs to the public. In recent editions of The Florida Bar News, which is an official publication of The Florida Bar, a survey of Florida lawyers disclosed that the median attorney salary in this state was approximately $71,000, while most attorneys with more than fifteen years' experience earn in excess of $100,000. Florida lawyers report $71,000 average income, Fla.Bar News, Sept. 1, 1990, at 1, col. 1. Meanwhile, the 1990 per capita income for all Floridians was only $18,586. U.S. Dep't of Commerce, 71 Survey of Current Business 33 (1991). This wide disparity in income shows not only how profitable the franchise to practice law can be; it also poignantly demonstrates that legal services lie beyond the means of most Floridians, who cannot afford to pay large retainers and steep hourly rates charged by many lawyers.
Today, I would fulfill this Court's duty to give fuller effect to article I, section 21 of the Florida Constitution. I would do so by ordering that the president of The Florida Bar appoint a committee as soon as is practicable, representing a fair cross-section of the membership of The Florida Bar, with proportional representation for all minorities. I would order that several nonlawyer members be appointed to represent the interests of the public at large. This committee would be charged with expeditiously developing recommendations to be submitted for this Court's approval.
At a minimum, this proposal would be required to include the following:
(a) A new Rule Regulating The Florida Bar requiring every licensed attorney to engage in no less than twenty hours of pro bono service[11] each year for the benefit of individuals who certifiably cannot afford access to legal services.
(b) A method for determining and certifying that individuals receiving such services fall into an income bracket that renders them unable to afford legal services.
(c) A method for determining when pro bono services rendered to an agency or organization will benefit individuals described in (b).
(d) A method for determining which members of The Florida Bar will be exempt from the pro bono obligation because of the ethical constraints of their present employment, disciplinary actions against them, the fact that they are inactive members of The Florida Bar or otherwise are precluded from practicing law, or other reasons consistent with the Rules of Professional Conduct or the Code of Judicial Conduct.
I would order that these recommendations must be submitted to this Court no later than one year after the date this opinion becomes final so that the matter can be scheduled for oral argument. At that time, the proposed changes would be published in The Florida Bar News and comments would be sought from all interested parties. The case then would be argued before this Court and final disposition would be taken.
Finally, I would publicly call on every Florida attorney to contribute an additional thirty hours of pro bono services[12] benefiting either the poor, charitable organizations, civic endeavors, or other activities that benefit the public. However, this would be a nonmandatory aspirational goal, not subject to any reporting requirement.
The time has come for this state's Bar to place itself in the forefront of this nation's jurisdictions by fulfilling the mandate of the Florida Constitution. As attorneys, we too often are seen as a dour and greedy profession that enriches itself through legal subtleties we ourselves have created. In light of the highly publicized excesses of *60 some of our members, it is all too easy for the public to forget that the complexity of the law primarily reflects the complexity of our present society.
Yet the criticisms leveled at us by the public clearly have some merit. In Florida, as in many other states, the right to practice law is a franchise both conferred and regulated by the practitioners themselves. Our own Constitution requires that the practice of law be regulated exclusively by the seven attorneys who are privileged to be Justices of this Court. Art. V, § 15, Fla. Const. In the popular eye, this arrangement looks suspiciously like the foxes are establishing the rules of access to the henhouse. Try as we may, the Florida legal profession will never shake this unseemly image until we have demonstrated to the public that we take our Constitution seriously and that we will live up to its dictates, even if it diminishes our own pocketbooks. The time has come for us to do just that.
NOTES
[1] In re Amendments to Rules, 573 So.2d 800 (Fla. 1990).
[2] We commend the chairman and members of the Commission for their diligent efforts in arriving at a specific means to address this significant problem.
[3] See Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (right to counsel in a death case); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel for noncapital serious offenses); In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (right to counsel in juvenile delinquency proceedings where the issue concerns the commitment of the juvenile for criminal conduct); Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) (right to counsel for petit offenses whenever imprisonment could be imposed).
[4] In re D.B., 385 So.2d 83 (Fla. 1980).
[5] The ABA Post-Conviction Death Penalty Representation Project, Time and Expense Analysis in Post-Conviction Death Penalty Cases, at 12, 18, 20 (1987), reflects that law firms in Florida representing defendants in these proceedings on a pro bono basis expend an average of 3,656 hours (includes attorney and support staff time) and $18,467 in out-of-pocket costs for this type of representation.
[6] I note additionally the educational opportunity that pro bono legal services provide to the legal profession. Wrestling with the legal problems encountered by a significant segment of society not normally encountered by a significant segment of the bar would certainly enhance a lawyer's knowledge and understanding of how those problems impact on the availability of "justice for all." It is only through knowledge and understanding that any shortcomings in our system of justice will be corrected.
[7] Indeed, this Court has established a Guardian Ad Litem Program precisely because of the needs of such children. Presently, the Program depends entirely on volunteers to provide the grass-roots representation of children. See In re State of Florida Guardian Ad Litem Program Minimal Standards of Operation (Fla. Feb. 18, 1985) (administrative order).
[8] See The Florida Supreme Court Gender Bias Study Commission Final Report 44-85 (March 1990).
[9] Chief Justice Douglas was appointed to his post the year Florida became a state in 1845. Joseph A. Boyd, Jr. & Randall Reder, A History of the Florida Supreme Court, 35 U.Miami L.Rev. 1019, 1021-22 (1981).
[10] I do not believe, for example, that article I, section 21 requires the legislature to provide counsel to indigents in every civil case. While such a procedure would be laudable, it also involves serious questions about the use of the state's financial resources, which already are overtaxed. The Constitution does not require the state to bankrupt itself in the name of helping the indigent. Under separation of powers, such a serious question of public finance should be left to the legislature. Art. II, § 3, Fla. Const.
[11] Obviously, credit only could be given for legal services provided without charging a fee. As has always been the case, "pro bono service" must consist of work that cannot lawfully be accomplished without a license to practice law. With respect to charities and civic organizations, for example, a lawyer could receive pro bono credit only for legal work, not for nonlegal work. When working for a charity, a lawyer could claim credit for drafting contracts or defending a suit, but not for fund solicitations or other nonlegal work.
[12] Once again, only legal services would be included within this category.