# Supreme Court of Florida

_____

No. SC14-1165

_____

**IN RE: AMENDMENTS TO RULE REGULATING
THE FLORIDA BAR 1-7.3.**

[July 9, 2015]

PER CURIAM.

Pursuant to Rule 1-12.1 of the Rules Regulating the Florida Bar (Bar

Rules),[1] 522 members in good standing with The Florida Bar (Petitioners) have

filed a petition asking the Court to amend Bar Rule 1-7.3(a) (Membership Fees;

Membership Fees Requirement) to authorize the Florida Bar Board of Governors

to increase annual Bar membership dues in order to provide additional funding to

The Legal Aid to the Poor Program of The Florida Bar Foundation.[2]  We wish to

commend Petitioners for bringing this important issue before the Court for

---

1.  Bar Rule 1-12.1(f) provides: "Petitions to amend these Rules Regulating The Florida Bar may be filed by the board of governors or by 50 members in good standing."

2.  We have jurisdiction.  See art. V, § 15, Fla. Const.

consideration—as Petitioners point out, the State of Florida is facing a significant decrease in funding for legal aid and there is an urgent need for new solutions to ensure that every person has equal access to our judicial system. However, because we believe this issue requires further study and a more comprehensive approach, we decline to adopt Petitioners' proposed amendment at this time.

## BACKGROUND

This Court has long recognized that an essential aspect of our common law adversarial system of justice is the role of lawyers as advocates. Equally important is the provision of legal representation to those who cannot afford it, in order to ensure meaningful access to justice for all persons. The Court has stated:

> Lawyers as advocates are essential to our common law adversary system. An adversarial system of justice requires legal representation on both sides in order for it to work properly. Without adversaries, the system would not work. Consequently, the obligation to represent the "defenseless and oppressed" is critical to our judicial system if it is to work properly for all segments of our society.

In re Amends. to Rules Reg. Fla. Bar—1-3.1(a) & Rules of Jud. Admin.—2.065 (Legal Aid), 573 So. 2d 800, 804 (Fla. 1990); see also Fla. Bar In re Emergency Delivery of Legal Services to the Poor (Mandatory Pro Bono), 432 So. 2d 39, 41 (Fla. 1983) ("There are people in need of legal services who are unable to pay for those services. All persons, however, should have the opportunity of obtaining effective legal services and should have meaningful access to the courts.").

In their petition in this case, Petitioners assert that Florida's delivery of legal services to the poor is in crisis. They allege that, in recent years, the number of people in Florida living below the poverty line has increased. Legal aid organizations across the state presently handle basic civil legal needs for many of these low income and disadvantaged Floridians. However, Petitioners point out some studies suggest that as much as 80 percent of the legal needs of the poor and disadvantaged are not being met. At the same time, funding and resources for legal aid have dropped dramatically. The Florida Bar Foundation projects a 34 percent decrease in funds available to allocate to legal aid organizations in the coming year. See "Foundation Poised to Reduce Legal Aid Grants," The Florida Bar News, December 1, 2014, at 1. This decrease in funding is expected to result in cuts to legal aid staff and resources.

The Florida Bar has in the past taken a leading role in providing a regular source of funding for legal aid services. In 1978, on a petition filed by the Florida Bar Board of Governors, this Court adopted the nation's first Interest on Trust Account (IOTA) program. See In re Interest on Trust Accounts, A Petition of the Fla. Bar, 356 So. 2d 799 (Fla. 1978). Through this program, the Court authorized attorneys, on a voluntary basis, to invest client funds in interest-bearing accounts. The earnings from these accounts are paid to The Florida Bar Foundation to, among other things, provide legal aid to the poor. Id. at 805, 807. In 1989, the

Court issued a decision making participation in the IOTA program mandatory. See Matter of Interest on Trust Accounts: A Petition to Amend the Rules Reg. Fla. Bar, 538 So. 2d 448 (Fla. 1989). The Court directed that all client funds "which are nominal or to be held for a short period of time" must be placed in an interest-bearing account, and the interest accrued from such accounts is provided to The Florida Bar Foundation to fund programs designed to improve the administration of justice and expand the delivery of legal services to the poor. Id. at 453.

Since these decisions, the IOTA program has continued to provide an important and substantial source of funding for legal aid organizations. However, as Petitioners point out, historic low interest rates have caused revenue from the IOTA program to fall dramatically. As a result, the Foundation is facing the exhaustion of its reserve funds this year. See "Foundation Poised to Reduce Legal Aid Grants," The Florida Bar News, December 1, 2014, at 1. Although many attorneys in Florida already generously donate their time and money to assist legal aid organizations, these contributions are not sufficient to fill the loss in funding. We agree with Petitioners that there is an urgent need to develop new solutions and sustainable sources of funding for legal aid.

## PROPOSED AMENDMENT

Petitioners urge the Court to amend Rule Regulating the Florida 1-7.3(a) (Membership Fees; Membership Fees Requirement) to add new language

providing that the Board of Governors "may increase the membership fees by $100 per annum provided any increase in the membership fees set by the board of governors shall be used as additional funding for the Legal Aid to the Poor Program of The Florida Bar Foundation." Petitioners maintain that their proposed amendment does not directly impose a $100 increase in dues; rather, they emphasize that the proposal would give the Board of Governors discretion to increase dues by no more than $100.

After the petition was filed, the Court published the proposal in The Florida Bar News for comment. Several organizations and members of the Bar filed comments, including The Florida Bar. While some of the commenters support Petitioners' proposal, we received a number of comments opposed to the amendment. Among those in opposition is The Florida Bar. The Bar raises several concerns. It contends: the proposal does not address the more global societal issue of how legal services will be provided to indigent persons; it requires only lawyers to pay for a societal issue; the proposed amendment does not address or suggest improvements in the delivery of legal aid services; Petitioners have not taken into account the donations of time and money already being made by Bar members; the proposal would essentially require all active members to make a non-voluntary contribution to the Florida Bar Foundation's Legal Aid program; the proposed amendment does not provide exemptions for judges or government

attorneys; it may require the Bar to request another rule amendment in the future when additional funds are needed for its own operating expenses; and finally, the proposed amendment may add additional administrative expenses associated with the Bar's collection and transmittal of funds to The Florida Bar Foundation.

We have thoroughly considered the proposal, and the comments in support and in opposition. We have also considered the issues discussed at oral argument. Although we agree with Petitioners that the members of The Florida Bar should take an active role in supporting legal aid organizations, we conclude that the proposal before us does not present the type of comprehensive solution that is needed to address the crisis in funding for legal aid.

At oral argument, all parties generally agreed that current sources of funding for legal aid are not sufficient to meet the growing need for such services. Indeed, the Bar stated at the oral argument that "access to essential legal services is a critical element of a democratic and just society" and that there is a "great need" for new solutions to ensure access to legal representation and other legal resources for all persons. However, the parties also generally acknowledged that Petitioners' proposal is not a "permanent fix." We think a more encompassing approach can be developed through the work of the newly established Florida Commission on Access to Civil Justice (Commission). In November 2014, Chief Justice Labarga established the Commission by Administrative Order to "study the remaining

unmet civil legal needs of disadvantaged, low income, and moderate income Floridians." In re Florida Commission on Access to Civil Justice, Fla. Admin. Order AOSC14-65 at 3 (November 24, 2014). Members of the Commission include leaders from the executive, legislative, and judicial branches of our state government, as well as The Florida Bar, The Florida Bar Foundation, various civil legal aid organizations, and the business community. The Commission is tasked to, among other things, "[i]dentify and examine barriers that impede access to civil justice"; determine how best to "promote coordination of legal services delivery to low income Floridians"; examine ways that technology may impact access to justice for disadvantaged, low and moderate income individuals; and examine how available resources might be effectively maximized and used to provide stable funding for legal aid services. Id. at 4-5. The Commission's work will provide studied and comprehensive recommendations to improve access to justice in this state. While Petitioners' proposal here warrants consideration, along with other possible solutions to the funding crisis, adopting any one approach to the problem at this stage would be premature. Accordingly, we do not adopt Petitioners' proposed amendment at this time.

In the interim, however, we strongly encourage lawyers in Florida to meet their ethical obligation to provide legal services to the poor and disadvantaged. Rule Regulating the Florida Bar 4-6.1 (Pro Bono Public Service) provides that

- 7 -

every member of the Bar, with the exception of certain specific groups of lawyers, should render pro bono legal services and participate in pro bono activities. Alternatively, Bar members are encouraged to make a donation of $350 to a legal aid organization. In adopting rule 4-6.1, we stated that the rule was intended to "assist each lawyer in Florida in fulfilling the commitment a lawyer makes upon taking the oath to become an officer of the court: 'I will never reject from any consideration personal to myself the cause of the defenseless or oppressed.' " Amends. to Rules Reg. Fla. Bar—1-3.1(a) & Rules of Jud. Admin.—2.065 (Legal Aid), 630 So. 2d 501, 502 (Fla. 1993). Here, we emphasize again that "[j]ustice is not truly justice if only the rich can afford counsel and gain access to the courts," and that members of the Bar should strive to donate their legal services to those who cannot afford them. Id. As Petitioners have made clear, legal aid organizations rely on members' donations of time and money to effectively meet the legal needs of the low income and disadvantaged, and such services are essential to helping ensure meaningful access to courts.

## CONCLUSION

Although we decline to adopt their proposal at this time, we wish to thank Petitioners for bringing this important issue before the Court for consideration, and we commend their altruism in recommending an increase in Bar dues to support legal aid organizations. The petition in this case brought to the forefront a

significant and critical issue affecting access to justice in our state. We believe a continuing discussion as to the best methods to fund legal aid programs, together with the work of the Florida Commission on Access to Civil Justice, will serve to strengthen equal access to our judicial system.

It is so ordered.

LABARGA, C.J., and PARIENTE, CANADY, and POLSTON, JJ., concur.
PARIENTE, J., concurs with an opinion, in which LABARGA, C.J., concurs.
LEWIS, J., dissents with an opinion.
QUINCE, J., dissents with an opinion, in which PERRY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I concur in the majority's decision to deny the petition at this time. I write separately to explain my reasoning for doing so and to emphasize the critical role of The Florida Bar in solving the current legal aid crisis.

**I.**

Access to justice for all Floridians is fundamental to our legal system and our state. Indeed, it is a fundamental constitutional right.[3] For years, this Court has been on the forefront of efforts to promote equal access to justice, and we must

---

3. Article I, section 21, of the Florida Constitution, provides: "The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay."

continue to ensure—as our Chief Justice has rightly prioritized—that we provide leadership on this issue.

I commend the Chief Justice for the creation of the Florida Commission on Access to Civil Justice and his laudable efforts to bring the governmental and business communities together to consider holistic solutions regarding the access to justice issue, in order to assist all individuals for whom legal services have become unaffordable. But the important work of that Commission is not, standing alone, the reason I join the majority in rejecting this proposal.

## A.

I agree with the majority's decision to deny the petition because the petition does not require The Florida Bar to raise the annual membership fee, and the Bar has steadfastly opposed the approach suggested by the Petitioners. In fact, if granting this petition would mandate that the Bar make the assessment of $100, I would join Justice Quince's dissent that recognizes the necessary role of lawyers in doing their part to solve this societal problem. While there is no one solution, dedicating additional funding to legal aid from the annual dues would be one step the legal community could take now to further its unique commitment to this cause—and to the many Floridians who are affected every day by the current crisis.

But however well-motivated those lawyers who have filed this petition, the petition does not currently ask this Court to mandate that the Bar assess each member up to $100 to dedicate to funding legal aid. As counsel for the Petitioners conceded during oral argument, even if this Court were to grant the petition, "no fees will be increased." Oral Argument at 01:08, <u>In re Amends. to Rule Reg. Fla. Bar 1-7.3</u>, No. SC14-1165, <u>available at</u> http://wfsu.org/gavel2gavel/viewcase.php?eid=2200 (Dec. 2, 2014).

This is because the Bar's leadership and its Board of Governors have unanimously stated that they would <u>not</u> vote to assess each Bar member any additional fee. In addition, and an issue in need of resolution prior to any decision to grant the petition, the Bar has raised concerns as part of its opposition that the manner in which the fee would be assessed could constitute an improper tax. For these reasons, I must join the majority in denying the petition at this time.

## B.

In concurring, however, I urge that the Bar work with the Petitioners to devise some alternative, creative solutions to the immediate crisis while the Commission on Access to Civil Justice undertakes its analysis and recommends long-term solutions to address this issue in a comprehensive way. As the Petitioners stated at oral argument, this petition "provides a point of discussion" and brings this issue to the forefront of "the Bar's radar." <u>Id.</u> at 43:55-44:15. I

certainly agree that it belongs there as a "first priority" and that these discussions are necessary to solving the crisis. Id at 44:30.

The denial of this petition neither prevents the Bar from increasing the annual fee and allocating a portion of the increased fee to support legal aid, nor suggests that such an approach ultimately may not be part of the cure to the legal aid crisis. Florida's annual Bar membership fee has not been increased since 2001 and remains comparably low relative to many other states around the country.[4]

The Bar has now recognized that the provision of legal services to low- and middle-income Floridians is a societal concern and that lawyers have a special obligation to fund and support legal aid services. Certainly, this provides much common ground upon which some of our legal community's leaders could come together. Both the efforts of the Bar—working in tandem with the Petitioners—and the efforts of the Commission are necessary to look at immediate funding alternatives for a more permanent fix. Nothing in the majority's opinion suggests otherwise. In my view, the Bar and all lawyers in this state should, in the

---

4. California, for example, requires active Bar members to pay an annual fee of $430, as compared to Florida's current $265 fee. See Rules of State Bar of Cal., App. A: Schedule of Charges & Deadlines (2015). Although fees vary nationwide, at least three states—Alaska, New Hampshire, and Oregon—have fees upwards of $500 yearly, which is nearly double the amount paid by Florida lawyers.

meantime, continue to do their part through pro bono representation and monetary contributions to legal aid.

## II.

Although addressing the current crisis will require broad-based solutions, the pivotal role of The Florida Bar cannot be understated. From the time of forming an integrated bar in 1949—that is, one that compelled membership for all attorneys licensed in Florida—this Court has emphasized the unique role of lawyers in society. See Petition of Fla. State Bar Ass'n, 40 So. 2d 902, 908-09 (Fla. 1949).

At that time, there were only 2,700 lawyers in Florida and the proposed annual dues were a mere $5.00. Id. at 903-04. Of the 2,700 lawyers, 1,631 returned ballots on the question of bar integration, with 1,131 in favor and 500 against. Id. at 904. In addition to determining whether integration would "best serve the interest of the bar and the public," one of the issues to be decided was whether this Court had the "power to require the payment of a membership fee as an incident to its power to integrate." Id.

In granting the petition, this Court observed that "the bar has a responsibility to the public that is unique and different in degree from that exacted of the members of other professions." Id. at 908. From the very beginning, the Oath of Attorney taken by every individual admitted to practice law in Florida has required each lawyer to affirm that he or she "will never reject, from any consideration

- 13 -

personal to myself, the cause of the defenseless or oppressed, or delay any person's cause for lucre or malice." In re Amends. to Rules Reg. Fla. Bar—1-3.1(a) & Rules of Jud. Admin.—2.065 (Legal Aid), 573 So. 2d 800, 803 (Fla. 1990) (emphasis omitted) (quoting Rules Relating to Ethics Governing Bench and Bar, 145 Fla. 763, 797 (1941)). "This provision identifies one of the specific public responsibilities lawyers have as officers of the court." Id.

In 1978, the initial step was taken regarding institutionalizing the manner in which the Bar could assist in ensuring those obligations when this Court authorized the first-of-its-kind rule creating Interest on Trust Accounts (IOTA), see Petition re Interest on Trust Accounts, 356 So. 2d 799 (Fla. 1978), which became the backbone in the ensuing decades of funding legal services for the poor, legal services for children, and innovative programs for improving the administration of justice. While that program began as voluntary, upon petition of concerned members of the Bar, IOTA became mandatory in 1989. Matter of Interest on Trust Accounts: Petition to Amend Rules Reg. Fla. Bar, 538 So. 2d 448, 451 (Fla. 1989).

During that same time period, a petition was filed by members of the Bar to mandate that lawyers provide twenty-five hours of free legal service to the poor or, in the alternative, donate $500 to the Florida Bar Foundation. In re Emergency Delivery of Legal Services to the Poor (Mandatory Pro Bono), 432 So. 2d 39, 40

- 14 -

(Fla. 1983). This Court explained that the "request ha[d] been prompted, in part, by recent federal budget cuts in funding for legal services programs." Id.

This Court rejected the proposal, but not without acknowledging the "unique position" that lawyers occupy in our society. Id. While we recognized that lawyers have a responsibility to render legal services to the poor, we also stated that the obligation to assure that "effective legal services are available to all is not the sole responsibility of lawyers but is one to be shared by the government and society." Id. at 41 n.1. We noted, however, the then-existing Ethical Considerations within the Code of Professional Responsibility:

> There are people in need of legal services who are unable to pay for those services. All persons, however, should have the opportunity of obtaining effective legal services and should have meaningful access to the courts. The legal profession and this Court have recognized that fact in Ethical Consideration 2-25, Code of Professional Responsibility:
>
>> Historically, the need for legal services of those unable to pay reasonable fees has been met in part by lawyers who donated their services or accepted court appointments on behalf of such individuals. The basic responsibility for providing legal services for those unable to pay ultimately rests upon the individual lawyer, and personal involvement in the problems of the disadvantaged can be one of the most rewarding experiences in the life of a lawyer. Every lawyer, regardless of professional prominence or professional workload, should find time to participate in serving the disadvantaged. The rendition of free legal services to those unable to pay reasonable fees continues to be an obligation of each lawyer, but the efforts of individual lawyers are often not enough to meet the need. Thus it has been necessary for the profession to

- 15 -

> institute additional programs to provide legal services. Accordingly, legal aid offices, lawyer referral services, and other related programs have been developed, and others will be developed, by the profession. Every lawyer should support all proper efforts to meet this need for legal services.

The responsibility of lawyers in this area is repeated in Ethical Consideration 8-3, Code of Professional Responsibility:

> The fair administration of justice requires the availability of competent lawyers. Members of the public should be educated to recognize the existence of legal problems and the resultant need for legal services, and should be provided methods for intelligent selection of counsel. Those persons unable to pay for legal services should be provided needed services.

The message to lawyers is thus plainly stated.

Id. at 41.

Although that petition to require mandatory pro bono services was ultimately rejected, this Court in 1991 once again considered the issue of access to justice and the obligation of Florida lawyers to represent the poor when called upon by the court. In re Amends. to Rules Reg. Fla. Bar, 573 So. 2d at 801. That effort was, like the others before it, led by individual prominent members of the Bar—some of whom, such as Talbot D'Alemberte, have been on the forefront of bringing this issue to the attention of this Court from the inception of the integrated bar through the present. While deferring action on the requirement that each judicial circuit develop a plan to address the legal needs of low-income individuals, we appointed a Joint Access Commission to further address the pressing issue. But

we were unwavering in our commitment to ensuring that all citizens have access to

the court system, including the ability to seek legal services:

> The poor's access to the legal system is an important factor that the commission will address. <u>In order for this justice system to maintain credibility, we realize that it must be available and affordable to all segments of society. Availability, not only for the poor, but also for those with limited funds, is another problem that merits the commission's consideration</u>. This Court and The Florida Bar have regularly adopted programs to improve the accessibility of our judicial system. These include simplified proceedings in small claims court, probate, and dissolution of marriage matters; the development of simplified forms for a litigant's <u>pro se</u> use; the establishment of citizen dispute settlement centers; and the recent implementation of mediation and arbitration programs designed to resolve disputes in an efficient and economical manner. This Court has repeatedly recognized its responsibility to assure access to the courts. We await the commission's recommendation before addressing petitioners' suggestions on how to best meet the needs of the poor. We request that the commission file its report by February 1, 1991.

> In conclusion, Thomas Jefferson once said: "There is a debt of service due from every man to his country proportioned to the bounties which nature and fortune have measured to him." The lawyers of this state have recognized that they have a debt of service to the poor in the oath each took upon becoming a member of the legal profession and an officer of the courts. <u>This important commitment assures a justice system for all. We acknowledge our responsibility to provide the necessary leadership to accomplish that goal</u>.

<u>Id.</u> at 806-07 (emphasis supplied) (footnote omitted).

Two years later, when the Joint Access Commission's report came back to

this Court, we recounted the key findings:

In this report, the Commission states that the "[c]ritical legal needs of the poor generally and of groups with special legal needs such as children, institutionalized persons, and migrant farm workers are not being met with present resources and will not be met with the presently anticipated increase in resources." The Commission "concludes that only approximately twenty percent of the legal needs of the poor are being addressed." In its thorough and detailed report, the Commission made thirty-one recommendations. . . .

In summary, recommendation No. 24: (a) describes a range of activities for volunteer lawyers; (b) suggests a minimum for each attorney of twenty hours of voluntary pro bono legal services, which can be collectively met under certain circumstances, or an alternative contribution to legal services of $350; (c) narrowly defines pro bono services to assure availability of legal services to the poor; (d) suggests that these services be developed and controlled by local community entities; (e) suggests that all lawyers be included in the plan to the extent legally and practically feasible; (f) suggests additional resources to support the plan; (g) describes a means to determine accountability of lawyer participation; and (h) suggests an evaluation and review of the effectiveness of this plan after two years.

The Board of Governors of The Florida Bar has endorsed the Commission's voluntary pro bono plan and urges its adoption with certain modifications. These modifications include: (1) eliminating the collective satisfaction of the twenty-hour requirement; (2) expanding the definition of pro bono services to include services to the poor which are not strictly legal in nature; and (3) eliminating the reporting requirement, primarily because of administrative costs.

The original petitioners generally approve the Commission's plan; however, they suggest that: (1) standards for pro bono services should be increased to fifty hours; (2) in lieu of the alternative payment of $350, an hourly rate of thirty dollars for all hours not performed should be charged; and (3) rather than having the chief judge of each circuit file his or her report with The Florida Bar, the reports should be filed with the Supreme Court, with The Florida Bar having an opportunity to file commentary. In response to The Florida Bar's suggestion that reporting not be required, Petitioners believe "the reporting requirement lies at the heart of this joint commission proposal" and state that the Commission's suggested format is

reasonable and should be implemented. Petitioners emphasize that the automatic review aspect of the report is important to allow the Court to directly assess the availability of legal services to the poor after this plan has been implemented. Similarly, the Projects Directors' Association, representing Legal Services Offices, recommends forty-eight hours per year as the pro bono standard and a thirty-dollar-per-hour opt-out provision.

Other responses oppose the Commission's recommendations. Professor Joseph Little asserts that the Commission's report includes no study designed to make a defensible investigation of the true dimensions of unmet legal needs of the poor; that the $350 opt-out plan is unconstitutional because it would be a tax; and that the judiciary should not be the chief planner and implementer in providing a legal services program. Harvey M. Alper objects to any activity by the Court in this particular area and asserts that charity by definition cannot be compelled and that the adoption of this plan will destroy more than it will generate in services to the poor. Jerry A. DeVane believes that the proposed minimum standards of voluntary pro bono service make such service mandatory. He also objects to lawyers being able to collectively satisfy their pro bono requirement. Henry Trawick asserts that the Commission's report is based on assumption, hearsay, and inadequate investigation, and that this Court is not vested with jurisdiction to provide for the general welfare.

In re Amends. to Rules Reg. Fla. Bar 1-3.1(a) & Rules of Jud. Admin. 2.065 (Legal Aid), 598 So. 2d 41, 41-42 (Fla. 1992). The diversity of views is striking, particularly because some of the same views, from some of the same people, still endure over two decades later.

This Court ultimately rejected the call for the mandatory obligation to provide legal aid services or to contribute $350, over the dissent of Justices Barkett and Kogan. Id. at 44. For his part, Justice Kogan eloquently observed:

In a very real sense, the present case involves many more people than just the privileged group of lawyers, legal scholars, and Bar officers who actually prepared and argued this cause. The people most seriously affected by this Court's actions today are precisely the ones who were not present—the people who can least afford an attorney and thus can ill afford to appear before us to argue their side of this issue. These are the people that, because of the economic realities of our legal system, effectively have been excluded from the same level of legal services available to the more affluent residents of Florida.

These dispossessed people are everywhere in our society. They include the abused, neglected, or abandoned children who too often become mere pawns of a legal process they certainly lack the skills to comprehend. They include the divorcing wife systematically denied a voice in a legal system that too often favors the divorcing husband's interests, because he too often is the one who holds the purse strings. They include the impoverished minorities unable to find legal representation because they are unable to pay even the most minimal fees charged by lawyers. They include the elderly on fixed incomes who cannot afford the cost of the legal services they need—even simple services such as planning for illness or drafting a will. The dispossessed include the mentally and physically disabled, whose conditions often have stripped them of the wherewithal necessary to obtain legal advice.

Id. at 56 (Kogan, J., concurring in part and dissenting in part) (footnotes omitted).

And, as Justice Barkett opined in advocating for mandatory pro bono services:

[T]he requirements of pro bono services derive from the status of lawyers as officers of the court and from the exclusive nature of the franchise they hold. I do not perceive the requirement as deriving from a moral obligation to "do good." As much as I would like to harness the tremendous energy and resources of lawyers—individually and collectively—to address the social and economic ills of this country, I do not believe that can be mandated. I do believe, however, for all the reasons so eloquently stated by Justice Kogan, that mandating legal representation for the indigent in order to assure meaningful access to the courts can and should be.

<u>Id.</u> at 55 (Barkett, J., concurring in part and dissenting in part).

In 1993, though still not mandating pro bono hours, this Court finally adopted the requirement that there be mandatory <u>reporting</u> of pro bono services and contributions, reasoning:

> The authority and responsibility of this Court to adopt rules on the issue of pro bono legal services to the poor under our constitutional rule-making and administrative authority has been fully addressed in prior opinions. We need not readdress that issue here. We do reiterate, however, that this Court, as the administrative head of the judicial branch, has the responsibility to ensure that access to the courts is provided for all segments of our society. Given the number of reports presented to this Court that document the legal needs of the poor, we find it necessary to implement the attached rules. Justice is not truly justice if only the rich can afford counsel and gain access to the courts. Consequently, these rules are being implemented in the hopes that they will act as <u>a</u> motivating force for the provision of legal services to the poor by the members of this state's legal profession.

<u>Amends. to Rules Reg. Fla. Bar—1-3.1(a) & Rules of Jud. Admin. 2.065 (Legal Aid)</u>, 630 So. 2d 501, 502 (Fla. 1993) (footnotes omitted). We explained the need for this mandatory reporting requirement as follows:

> [W]e do expect members of the Bar, through the simplified report form that will be made a part of the annual dues statement, to report how they have assisted in addressing the legal needs of the poor. We believe that accurate reporting is essential for evaluating this program and for determining what services are being provided under the program. This, in turn, will allow us to determine the areas in which the legal needs of the poor are or are not being met. Because we find that reporting is essential, failure to report will constitute an offense subject to discipline.

<u>Id.</u> at 502-03.

Since 1993, no further steps have been taken by the Bar to increase the amount of pro bono hours or to consider the imposition of any other mandatory obligations. Instead, in 1997, the Bar actually petitioned this Court to <u>eliminate</u> the mandatory annual reporting requirement, arguing that even that obligation should be voluntary. We rejected the Bar's petition:

> As the opponents of the amendment point out, there have been no fundamental changes in the circumstances surrounding this issue since the Court first determined that accurate reporting is essential for evaluating the delivery of legal services to the poor and for determining where such services are not being provided. There is no more effective way to gauge the success of lawyers in meeting their obligation to represent the poor—an obligation every member of the Bar swears to undertake.

> Lawyers have been granted a special boon by the State of Florida—they in effect have a monopoly on the public justice system. <u>In return, lawyers are ethically bound to help the State's poor gain access to that system.</u> The mandatory reporting requirement is essential to guaranteeing that lawyers do their part to provide equal justice.

<u>Amends. to Rule 4-6.1 of Rules Reg. Fla. Bar—Pro Bono Pub. Serv.</u>, 696 So. 2d 734, 735 (Fla. 1997).

That brings us to today, almost two decades later, when once again the issue has been presented to this Court through a petition filed by exemplary members of The Florida Bar, rather than by the Bar itself, which opposes any increase in the annual dues to fund legal aid services. But as the history of this issue

demonstrates, going forward, it is essential that the Bar play a leading role in solving the current crisis.

As this Court has previously noted, "this is not a problem with a simple solution," but "a solution is necessary if our justice system is to be accessible for all segments of society." In re Amends. to Rules Reg. Fla. Bar, 598 So. 2d at 42. Because of "the unique and important role" lawyers play "in protecting individual rights," id., the Bar must work diligently to ensure that equal access to justice is a reality for all Floridians, rather than simply an aspiration.

**III.**

In conclusion, I join the majority in rejecting the petition at this time because it does not require the Bar to raise the annual dues and the Bar has unanimously opposed the petition. I urge, however, that the Bar work with the Petitioners to find solutions to the current crisis while the Commission on Access to Civil Justice undertakes its diligent work, including consideration of increasing the number of pro bono hours or the amount of money contributed and consideration of making that a mandatory requirement, as advocated by Justices Barkett and Kogan.

While I am aware that the Bar has extended loan guarantees to the Florida Bar Foundation, I am confident that there are additional creative solutions to ensure that the valued employees of legal aid organizations can continue their work and that the bleeding of these essential services does not continue unabated. We

can and we must do more—now.  Finally, I once again thank our Chief Justice for being on the front lines of providing the necessary leadership, never missing an opportunity to advocate and promote public awareness of this critical issue.

LABARGA, C.J., concurs.

LEWIS, J., dissenting.

It is truly an unfortunate day for Florida as a majority of this Court professes to be protecting the legal needs of many Floridians while it is actually rejecting the very simple availability of a limited tool to provide possible relief and a safety net to at least some most in need.  I fully agree that the lawyers of this State cannot and should not be required to be the group of individuals solely and exclusively responsible for the monetary needs or programs necessary to provide access to justice for all Florida citizens.  The petition we consider today does not seek such a result and was never designed or intended to reach that result.  A number of outstanding members of The Florida Bar have simply requested that The Florida Bar be authorized (not mandated) to generate additional funds (not mandatory) as a tool for attempting to enhance access to justice for at least some Floridians in need.

This Court, rather than understanding that the current crisis is multi-layered and will probably require a number of different alternatives and approaches, rejects and disallows this tool and the help and safety net it could provide for a stated unknown and theoretical "more encompassing approach."  This philosophy of

refusing the availability of this non-mandatory limited tool because it does not guarantee to solve all problems immediately at one time is both misdirected and puzzling. The access to justice issue in Florida is as wide and deep as the social and economic inequalities within which our society operates. In my view, at least one element absolutely essential to any attempted solution will include access to and the availability of competent counsel to provide legal representation. Directly associated with this element will be support resources to deal with both the complexities and expenses associated with legal matters. There must be ways to fund these needs if we are to move forward. A state-wide, highly structured, and strictly enforced mandatory pro bono program similar to several existing local programs may eliminate the need for some direct-attorney costs, but the associated support costs and expenses of such efforts will still need funding. Using a military metaphor, equal access to justice will require the "boots of lawyers on the ground" and in the trenches to cause "equal access" to become a reality. I suggest that there is an absence of a rational and a reasonable foundation to reject the establishment of the availability of this limited tool. The proponents in favor of allowing the creation of this additional tool have never suggested that the proposal is, would, or should become a total solution to the enormous problem facing so many Floridians or become the financial responsibility of lawyers exclusively. However, we now

know with certainty that no Floridian can ever be assisted through the proposed supplementary tool that has been crushed today.

The excuse proffered by some to reject the authorization to create a possible funding mechanism is based on the distinction that the authorization is not mandatory because The Florida Bar opposes the concept. This faulty reasoning overlooks that the leadership of The Florida Bar changes annually and the Board of Governors changes from time to time. This rejection simply ensures that should a Florida Bar program be desired in the future, we will need to repeat this process with its delays again.

Committees and commissions may perform outstanding services and easily solve every problem and issue which adversely impacts access to justice and remedy all ills with a single approach. If that is so, the authorization sought today would not harm or interfere with that total resolution. If that is not so, or a solution requires many years and many facets, we have simply delayed help. I cannot subscribe to a theory that we authorize nothing unless we can resolve all. This reminds me of the story of the lawyer who traveled to the nursing home with the absolute best intentions of assisting the disabled and infirm. Upon his return home, inquiry was made as to how he had assisted the infirm that day. The lawyer responded that so many of those in the nursing home needed soft shoes and a comfortable chair that he did not have the resources to provide soft shoes and

comfortable chairs for all, so he simply provided none. His family replied with great disappointment that the solution to many large problems may begin in the purchase of a single pair of soft shoes and a single comfortable chair.

I am part of the disappointed Court family who believes that one positive step at a time and one authorization at a time is far better than waiting until committees and commissions make recommendations that may or may not be fulfilled.

QUINCE, J., dissenting.

While I do not believe that lawyers should be solely responsible for providing the monetary assistance to help the poor and the middle class have access to our courts, I do believe that it is a part of our responsibility as lawyers to assist in this endeavor. I recognize that lawyers have for years contributed so that others have access to our legal system through both the giving of money and the giving of their time and talent. However, in this time of crisis, we would not be remiss in giving The Florida Bar the authority to require lawyers to dig just a little bit deeper to ensure that our courts remain open and accessible to all in need. See art. I, § 21, Fla. Const. ("The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay."). Therefore, I would authorize The Florida Bar to require lawyers to pay up to $100 a year with their Florida Bar renewal.

PERRY, J., concurs.

Original Proceeding – Rules Regulating The Florida Bar

Raoul G. Cantero, III of White & Case LLP, Miami, Florida,

    for Petitioners

Charles Edward Berk of Charles E. Berk, P.A., Ocala, Florida; Paul Stephen Cherry, Sarasota, Florida; Charles Malouf Samaha, Saint Petersburg, Florida; William W. Fernandez, Winter Springs, Florida; Henry P. Trawick, Jr., Sarasota, Florida; Patrick Christopher Crotty of The Law Office of Scott D. Owens, Hallandale, Florida; Austyn Wayne Sanders, Miami, Florida; Paul C. Doyle, Jacksonville, Florida; Anne Lisa Swerlick, Tallahassee, Florida; John F. Harkness, Jr., Executive Director, Gregory W. Coleman, President, and Ramón A. Abadin, President-elect, The Florida Bar, Tallahassee, Florida; Patience Denise Burke, Tallahassee, Florida; James Anthony Kowalski, Jr., 2014-2015 President, Project Directors Association, Jacksonville, Florida; Robert T. Strain, Saint Petersburg, Florida; and Barry Scott Richard of Greenberg Traurig, P.A., Tallahassee, Florida;

    Responding with Comments